Alan H. Weinreb, Esq.
THE MARGOLIN & WEINREB LAW GROUP, LLP
165 Eileen Way, Suite 101
Syosset, New York 11791
Telephone: (516) 945-6055
alan@nyfclaw.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
WINDWARD BORA LLC,

                                     Plaintiff,

           -against-                                  CERTIFICATE OF
                                                                  MERIT AFFIRMATION
VADIM BORODYANSKY AND ALLA RYTOVA         PURSUANT TO
                                                                   CPLR 3012-B
                                     Defendant(s).
-----------------------------------------------------------------X

       Alan Weinreb Esq. pursuant to CPLR §2106 and under the penalties of perjury, affirms as follows:

1. I am an attorney at law duly licensed to practice in the state of New York and am affiliated with The Margolin & Weinreb Law Group, LLP, the attorneys of record for Plaintiff in the above-captioned mortgage foreclosure action. As such, I am fully aware of the underlying action, as well as the proceedings had herein.

2. On August 6, 2019, I communicated with the following representative or representatives of Plaintiff, who informed me that he (a) personally reviewed plaintiff's documents and records relating to this case for factual accuracy; and (b) confirmed the factual accuracy of the allegations set forth in the Complaint and any supporting affidavits or affirmations filed with the Court, as well as the accuracy of the notarizations contained in the supporting documents filed therewith.

       Name: Yonel Devico                       Title: Member

3. Based upon my communication with Yonel Devico, as well as upon my own inspection, review and other reasonable inquiry under the circumstances, including, but not limited to the review of the facts of the case as well as of the underlying note, mortgage and assignments, if any, modification(s), if any and extension and consolidations, if any, I affirm that, to the best of my knowledge, information, and belief, there is a reasonable basis for the commencement of the within foreclosure action and that the Plaintiff is currently the creditor entitled to enforce the rights of said documents noted above. A copy of the note, mortgage and assignments, if any, modification(s), if any and extension and consolidations, if any, are annexed hereto.

4. I am aware of my obligations under New York Rules of Professional Conduct (22 NYCRR Part 1200) and 22 NYCRR Part 130.

Dated: August 9, 2019
      Syosset, New York

                                            /s/ Alan H. Weinreb
                                            Alan H. Weinreb, Esq.

4489298160907699




Office of the
Richmond County Clerk
130 Stuyvesant Place
Staten Island, NY 10301

Hon. Stephen J. Fiala, County Clerk

ACS-000000000372204-000000000501212-006

### Recording and Endorsement Cover Page

| | |
|---|---|
| Document Type: | MORTGAGE |
| Document Page Count: | 6 |

| PRESENTER: | RETURN TO: |
|---|---|
| PNC BANK | PNC BANK |
| 6750 MILLER RD | 6750 MILLER RD |
| BRECKSVILLE, OH 44141 | BRECKSVILLE, OH 44141 |

PROPERTY DATA     # OF BLOCKS   1    # OF LOTS   1
Block   Lot           Unit
5321    0108 Entire Lot

### PARTIES

| MORTGAGOR INDEX | MORTGAGEE INDEX |
|---|---|
| VADIM BORODYANSKY | PNC BANK S/B/M TO NATIONAL CITY BANK |
| 98 SEACREST AVE | 6750 MILLER RD |
| STATEN ISLAND, NY 10312 | BRECKSVILLE, OH 44141 |
| "And Others" | |

**FEES PAID**

Mortgage Cons:            $408,000.00

### PAYMENT DETAIL

Make Checks Payable to:

```
================================================================
Richmond County Clerk:            42.00 Recording Fees
Richmond County Clerk:         8,334.00 Mortgage Tax
                              ----------
Total Payments For This Document:  8,376.00
================================================================
```

BORODYANSKY, VADIM
4489298160907699 Mortgage/Deed of Trust

edf60d9a-2b1e-4db2-a6c4-4eca4966782c

EXAM _____    DATE  APR 12 2013

RECORDED IN RICHMOND COUNTY

APR 15 2013

COUNTY CLERK

LAND DOC# 473577
24-MORTGAGES
MTAX: DE 692      $8,334.00
04/15/2013     10:53:23 A.M.
RECEIPT: 21545   FEE: $42.00
RICHMOND COUNTY CLERK

When recorded return to:
NCB, CLS BRECKSVILLE
LOCS, LOCATOR 7120
P.O. BOX 5570
CLEVELAND, OH 44101

SECTION: 23
BLOCK: 5321
LOT: 108
COUNTY: RICHMOND

——— State of New York ——— ——— Space Above This Line For Recording Data ———

# CREDIT LINE MORTGAGE
(With Future Advance Clause)

This is a Credit Line Mortgage as defined in New York Real Property Law section 281. The mortgage contemplates that Lender and Mortgagor will enter into a series of advances or advances, payments and readvances. The aggregate amount at any time outstanding will be limited as specified in this Security Instrument.

1. **DATE AND PARTIES.** The date of this Mortgage (Security Instrument) is ........ March 2, 2004 ........ and the parties, their addresses and tax identification numbers, if required, are as follows:
   **MORTGAGOR:**

   VADIM BORODYANSKY ALLA RYTOVA
   153 TENNYSON DR, STATEN ISLAND, New York, 10308

   ☐ If checked, refer to the attached Addendum incorporated herein, for additional Mortgagors, their signatures and acknowledgments.
   **LENDER:**

   NATIONAL CITY BANK

2. **CONVEYANCE.** For good and valuable consideration, the receipt and sufficiency of which is acknowledged, and to secure the Secured Debt (defined below) and Mortgagor's performance under this Security Instrument, Mortgagor grants, bargains, sells, conveys and mortgages to Lender, with power of sale, the following described property:

   The property is located in ...Richmond............................ at ..............................................
                                   (County)
   98 SEACREST AVE                  STATEN ISLAND                New York   10312
   ...........................................  ............................................  ...................  ............
          (Address)                          (City)                                          (ZIP Code)

   Together with all rights, easements, appurtenances, royalties, mineral rights, oil and gas rights, all water and riparian rights, wells, ditches, reservoirs, and water stock and all existing and future improvements, structures, fixtures, and replacements that may now, or at any time in the future, be part of the real estate described above (all referred to as "Property").

3. **MAXIMUM OBLIGATION LIMIT.** The total principal amount secured by this Security Instrument at any one time shall not exceed $ ........408,000.00........... . This limitation of amount does not include interest and other fees and charges validly made pursuant to this Security Instrument. Also, this limitation does not apply to advances made under the terms of this Security Instrument to protect Lender's security and to perform any of the covenants contained in this Security Instrument.

4. **SECURED DEBT AND FUTURE ADVANCES.** The term "Secured Debt" is defined as follows:
   A. Debt incurred under the terms of all promissory note(s), contract(s), guaranty(s) or other evidence of debt described below and all their extensions, renewals, modifications or substitutions. (You must specifically identify the debt(s) secured and you should include the final maturity date of such debt(s).)
   Maturity Date: 3/02/2024

   Pursuant to the terms of one or more of the note(s), contract(s), or guaranty(s), the parties reasonably contemplate entering into a series of advances, payments, advances, and readvances.

NEW YORK - CREDIT LINE MORTGAGE (NOT FOR FNMA, FHLMC, FHA OR VA USE)
©1995, 1997 Bankers Systems, Inc., St. Cloud, MN Form OCP-REMTG-NY 8/14/98

*V.B*   *aR*   (page 1 of 4)

B. All future advances from Lender to Mortgagor or other future obligations of Mortgagor to Lender under any promissory note, contract, guaranty, or other evidence of debt existing now or executed after this Security Instrument whether or not this Security Instrument is specifically referenced. If more than one person signs this Security Instrument, each Mortgagor agrees that this Security Instrument will secure all future advances and future obligations that are given to or incurred by any one or more Mortgagor, or any one or more Mortgagor and others. All future advances and other future obligations are secured by this Security Instrument even though all or part may not yet be advanced. All future advances and other future obligations are secured as if made on the date of this Security Instrument. If those advances are made within 20 years from the date of the recording of this Security Instrument. Advances made more than 20 years after this Security Instrument was recorded are also secured, but may not be secured to the same extent as advances made within 20 years of recording. Nothing in this Security Instrument shall constitute a commitment to make additional or future loans or advances in any amount. Any such commitment must be agreed to in a separate writing.

C. All other obligations Mortgagor owes to Lender, which may later arise, to the extent not prohibited by law, including, but not limited to, liabilities for overdrafts relating to any deposit account agreement between Mortgagor and Lender.

D. All additional sums advanced and expenses incurred by Lender for insuring, preserving or otherwise protecting the Property and its value and any other sums advanced and expenses incurred by Lender under the terms of this Security Instrument.

In the event that Lender fails to provide any necessary notice of the right of rescission with respect to any additional indebtedness secured under paragraph B of this Section, Lender waives any subsequent security interest in the Mortgagor's principal dwelling that is created by this Security Instrument (but does not waive the security interest for the debts referenced in paragraph A of this Section).

5. MORTGAGE COVENANTS. Mortgagor agrees that the covenants in this section are material obligations under the Secured Debt and this Security Instrument. If Mortgagor breaches any covenant in this section, Lender may refuse to make additional extensions of credit and may reduce the credit limit. By not exercising either remedy on Mortgagor's breach, Lender does not waive Lender's right to later consider the event a breach if it happens again.

Payments. Mortgagor agrees that all payments under the Secured Debt will be paid when due and in accordance with the terms of the Secured Debt and this Security Instrument.

Prior Security Interests. With regard to any other mortgage, deed of trust, security agreement or other lien document that created a prior security interest or encumbrance on the Property, Mortgagor agrees to make all payments when due and to perform or comply with all covenants. Mortgagor also agrees not to allow any modification or extension of, nor to request any future advances under any note or agreement secured by the lien document without Lender's prior written approval.

Claims Against Title. Mortgagor will pay all taxes, assessments, liens, encumbrances, lease payments, ground rents, utilities, and other charges relating to the Property when due. Lender may require Mortgagor to provide to Lender copies of all notices that such amounts are due and the receipts evidencing Mortgagor's payment. Mortgagor will defend title to the Property against any claims that would impair the lien of this Security Instrument. Mortgagor agrees to assign to Lender, as requested by Lender, any rights, claims or defenses Mortgagor may have against parties who supply labor or materials to maintain or improve the Property.

Property Condition, Alterations and Inspection. Mortgagor will keep the Property in good condition and make all repairs that are reasonably necessary. Mortgagor shall not commit or allow any waste, impairment, or deterioration of the Property. Mortgagor agrees that the nature of the occupancy and use will not substantially change without Lender's prior written consent. Mortgagor will not permit any change in any license, restrictive covenant or easement without Lender's prior written consent. Mortgagor will notify Lender of all demands, proceedings, claims, and actions against Mortgagor, and of any loss or damage to the Property.

Lender or Lender's agents may, at Lender's option, enter the Property at any reasonable time for the purpose of inspecting the Property. Lender shall give Mortgagor notice at the time of or before an inspection specifying a reasonable purpose for the inspection. Any inspection of the Property shall be entirely for Lender's benefit and Mortgagor will in no way rely on Lender's inspection.

Authority to Perform. If Mortgagor fails to perform any duty or any of the covenants contained in this Security Instrument, Lender may, without notice, perform or cause them to be performed. Mortgagor appoints Lender as attorney in fact to sign Mortgagor's name or pay any amount necessary for performance. Lender's right to perform for Mortgagor shall not create an obligation to perform, and Lender's failure to perform will not preclude Lender from exercising any of Lender's other rights under the law or this Security Instrument.

Leaseholds; Condominiums; Planned Unit Developments. Mortgagor agrees to comply with the provisions of any lease if this Security Instrument is on a leasehold. If the Property includes a unit in a condominium or a planned unit development, Mortgagor will perform all of Mortgagor's duties under the covenants, by-laws, or regulations of the condominium or planned unit development.

Condemnation. Mortgagor will give Lender prompt notice of any pending or threatened action, by private or public entities to purchase or take any or all of the Property through condemnation, eminent domain, or any other means. Mortgagor authorizes Lender to intervene in Mortgagor's name in any of the above described actions or claims. Mortgagor assigns to Lender the proceeds of any award or claim for damages connected with a condemnation or other taking of all or any part of the Property. Such proceeds shall be considered payments and will be applied as provided in this Security Instrument. This assignment of proceeds is subject to the terms of any prior mortgage, deed of trust, security agreement or other lien document.

Insurance. Mortgagor shall keep the Property insured against loss by fire, flood, theft and other hazards and risks reasonably associated with the Property due to its type and location. This insurance shall be maintained in the amounts and for the periods that Lender requires. The insurance carrier providing the insurance shall be chosen by Mortgagor subject to Lender's approval, which shall not be unreasonably withheld. If Mortgagor fails to maintain the coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property according to the terms of this Security Instrument.

All insurance policies and renewals shall be acceptable to Lender and shall include a standard "mortgage clause" and, where applicable, "loss payee clause." Mortgagor shall immediately notify Lender of cancellation or termination of the insurance. Lender shall have the right to hold the policies and renewals. If Lender requires, Mortgagor shall immediately give to Lender all receipts of paid premiums and renewal notices. Upon loss, Mortgagor shall give immediate notice to the insurance carrier and Lender. Lender may make proof of loss if not made immediately by Mortgagor.

Unless otherwise agreed in writing, all insurance proceeds shall be applied to the restoration or repair of the Property or to the Secured Debt, whether or not then due, at Lender's option. Any application of proceeds to principal shall not extend or postpone the due date of scheduled payment nor change the amount of any payment. Any excess will be paid to the Mortgagor. If the Property is acquired by Lender, Mortgagor's right to any insurance policies and proceeds resulting from damage to the Property before the acquisition shall pass to Lender to the extent of the Secured Debt immediately before the acquisition.

© 1995, 1997 Bankers Systems, Inc., St. Cloud, MN Form OCP-REMTG-NY 9/14/99    *V.B*    *aR*    (page 2 of 4)

**Financial Reports and Additional Documents.** Mortgagor will provide to Lender upon request, any financial statement or information Lender may deem reasonably necessary. Mortgagor agrees to sign, deliver, and file any additional documents or certifications that Lender may consider necessary to perfect, continue, and preserve Mortgagor's obligations under this Security Instrument and Lender's lien status on the Property.

6. **DUE ON SALE.** Lender may, at its option, declare the entire balance of the Secured Debt to be immediately due and payable upon the creation of, or contract for the creation of, a transfer or sale of the Property. This right is subject to the restrictions imposed by federal law (12 C.F.R. 591), as applicable.

7. **WARRANTY OF TITLE.** Mortgagor warrants that Mortgagor is or will be lawfully seized of the estate conveyed by this Security Instrument and has the right to grant, bargain, convey, sell, and mortgage, with power of sale, the Property. Mortgagor also warrants that the Property is unencumbered, except for encumbrances of record.

8. **DEFAULT.** Mortgagor will be in default if any of the following occur:

   **Fraud.** Any Consumer Borrower engages in fraud or material misrepresentation in connection with the Secured Debt that is an open end home equity plan.

   **Payments.** Any Consumer Borrower on any Secured Debt that is an open end home equity plan fails to make a payment when due.

   **Property.** Any action or inaction by the Borrower or Mortgagor occurs that adversely affects the Property or Lender's rights in the Property. This includes, but is not limited to, the following: (a) Mortgagor fails to maintain required insurance on the Property; (b) Mortgagor transfers the Property; (c) Mortgagor commits waste or otherwise destructively uses or fails to maintain the Property such that the action or inaction adversely affects Lender's security; (d) Mortgagor fails to pay taxes on the Property or otherwise fails to act and thereby causes a lien to be filed against the Property that is senior to the lien of this Security Instrument; (e) a sole Mortgagor dies; (f) if more than one Mortgagor, any Mortgagor dies and Lender's security is adversely affected; (g) the Property is taken through eminent domain; (h) a judgment is filed against Mortgagor and subjects Mortgagor and the Property to action that adversely affects Lender's interest; or (i) a prior lienholder forecloses on the Property and as a result, Lender's interest is adversely affected.

   **Executive Officers.** Any Borrower is an executive officer of Lender or an affiliate and such Borrower becomes indebted to Lender or another lender in an aggregate amount greater than the amount permitted under federal laws and regulations.

9. **REMEDIES ON DEFAULT.** In addition to any other remedy available under the terms of this Security Instrument, Lender may accelerate the Secured Debt and foreclose this Security Instrument in a manner provided by law if Mortgagor is in default. In some instances, federal and state law will require Lender to provide Mortgagor with notice of the right to cure, or other notices and may establish time schedules for foreclosure actions.

   At the option of Lender, all or any part of the agreed fees and charges, accrued interest and principal shall become immediately due and payable, after giving notice if required by law, upon the occurrence of a default or any time thereafter. If there is a default, Lender may, in addition to any other permitted remedy, advertise and sell the Property as a whole or in separate parcels at public auction to the highest bidder.

   The acceptance by Lender of any sum in payment or partial payment on the Secured Debt after the balance is due or is accelerated or after foreclosure proceedings are filed shall not constitute a waiver of Lender's right to require complete cure of any existing default. By not exercising any remedy on Mortgagor's default, Lender does not waive Lender's right to later consider the event a default if it happens again.

10. **EXPENSES; ADVANCES ON COVENANTS; ATTORNEYS' FEES; COLLECTION COSTS.** If Mortgagor breaches any covenant in this Security Instrument, Mortgagor agrees to pay all expenses Lender incurs in performing such covenants or protecting its security interest in the Property. Such expenses include, but are not limited to, fees incurred for inspecting, preserving, or otherwise protecting the Property and the Lender's security interest. These expenses are payable on demand and will bear interest from the date of the payment until paid in full at the highest interest rate in effect as provided in the terms of the Secured Debt. Mortgagor agrees to pay all costs and expenses incurred by Lender in collecting, enforcing or protecting Lender's rights and remedies under this Security Instrument. This amount may include, but is not limited to, reasonable attorneys' fees not in excess of 15% of the unpaid debt if the loan is referred for collection to an attorney who is not a salaried employee of the Lender, court costs, and other legal expenses. To the extent permitted by the United States Bankruptcy Code, Mortgagor agrees to pay the reasonable attorneys' fees Lender incurs to collect the Secured Debt as awarded by any court exercising jurisdiction under the Bankruptcy Code. This Security Instrument shall remain in effect until released. Mortgagor agrees to pay for any recordation costs of such release.

11. **ENVIRONMENTAL LAWS AND HAZARDOUS SUBSTANCES.** As used in this section, (1) Environmental Law means, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA, 42 U.S.C. 9601 et seq.), and all other federal, state and local laws, regulations, ordinances, court orders, attorney general opinions or interpretive letters concerning the public health, safety, welfare, environment or a hazardous substance; and (2) Hazardous Substance means any toxic, radioactive or hazardous material, waste, pollutant or contaminant which has characteristics which render the substance dangerous or potentially dangerous to the public health, safety, welfare or environment. The term includes, without limitation, any substances defined as "hazardous material," "toxic substances," "hazardous waste" or "hazardous substance" under any Environmental Law.

    Mortgagor represents, warrants and agrees that:
    A. Except as previously disclosed and acknowledged in writing to Lender, no Hazardous Substance is or will be located, stored or released on or in the Property. This restriction does not apply to small quantities of Hazardous Substances that are generally recognized to be appropriate for the normal use and maintenance of the Property.
    B. Except as previously disclosed and acknowledged in writing to Lender, Mortgagor and every tenant have been, are, and shall remain in full compliance with any applicable Environmental Law.
    C. Mortgagor shall immediately notify Lender if a release or threatened release of a Hazardous Substance occurs on, under or about the Property or there is a violation of any Environmental Law concerning the Property. In such an event, Mortgagor shall take all necessary remedial action in accordance with any Environmental Law.
    D. Mortgagor shall immediately notify Lender in writing as soon as Mortgagor has reason to believe there is any pending or threatened investigation, claim, or proceeding relating to the release or threatened release of any Hazardous Substance or the violation of any Environmental Law.

12. **ESCROW FOR TAXES AND INSURANCE.** Unless otherwise provided in a separate agreement, Mortgagor will not be required to pay to Lender funds for taxes and insurance in escrow.

13. **JOINT AND INDIVIDUAL LIABILITY; CO-SIGNERS; SUCCESSORS AND ASSIGNS BOUND.** All duties under this Security Instrument are joint and individual. If Mortgagor signs this Security Instrument but does not sign an evidence of debt, Mortgagor does so only to mortgage Mortgagor's interest in the Property to secure payment of the Secured Debt and Mortgagor does not agree to be personally liable on the Secured Debt. If this Security Instrument secures a guaranty between Lender and Mortgagor, Mortgagor agrees to waive any rights that may prevent Lender from bringing any action

or claim against Mortgagor or any party indebted under the obligation. These rights may include, but are not limited to, any anti-deficiency or one-action laws. The duties and benefits of this Security Instrument shall bind and benefit the successors and assigns of Mortgagor and Lender.

14. **SEVERABILITY; INTERPRETATION.** This Security Instrument is complete and fully integrated. This Security Instrument may not be amended or modified by oral agreement. Any section in this Security Instrument, attachments, or any agreement related to the Secured Debt that conflicts with applicable law will not be effective, unless that law expressly or impliedly permits the variations by written agreement. If any section of this Security Instrument cannot be enforced according to its terms, that section will be severed and will not affect the enforceability of the remainder of this Security Instrument. Whenever used, the singular shall include the plural and the plural the singular. The captions and headings of the sections of this Security Instrument are for convenience only and are not to be used to interpret or define the terms of this Security Instrument. Time is of the essence in this Security Instrument.

15. **NOTICE.** Unless otherwise required by law, any notice shall be given by delivering it or by mailing it by first class mail to the appropriate party's address on page 1 of this Security Instrument, or to any other address designated in writing. Notice to one mortgagor will be deemed to be notice to all mortgagors.

16. **AGREEMENTS ABOUT NEW YORK LIEN LAW.** If any part of the secured debt is intended or represented to be used for improvements to the Property, Mortgagor will receive all amounts lent to Mortgagor by Lender subject to the trust fund provisions of Section 13 of the New York Lien Law.

17. **MORTGAGE TAX.**
    ☐ The Property covered by this Mortgage is or will be improved by a one or two family residence or dwelling.
    ☐ The Property covered by this Mortgage  ☐ is  ☐ is not  real property improved by one or more structures containing in the aggregate not more than six residential dwelling units, each with separate cooking facilities.

18. **LINE OF CREDIT.** The Secured Debt includes a revolving line of credit. Although the Secured Debt may be reduced to a zero balance, this Security Instrument will remain in effect until released.

19. **APPLICABLE LAW.** This Security Instrument is governed by the laws as agreed to in the Secured Debt, except to the extent otherwise required by the laws of the jurisdiction where the Property is located, and applicable federal laws and regulations.

20. **RIDERS.** The covenants and agreements of each of the riders checked below are incorporated into and supplement and amend the terms of this Security Instrument.
    [Check all applicable boxes]
    ☐ Assignment of Leases and Rents  ☐ Other ............................................................................

21. ☐ **ADDITIONAL TERMS.**

Prepared by:
PAMELA WATTS, National City Bank
6750 Miller Road, Brecksville, OH 44141

DEFAULT IN THE PAYMENT OF THIS LOAN AGREEMENT MAY RESULT IN THE LOSS OF THE PROPERTY SECURING THE LOAN. UNDER FEDERAL LAW, YOU MAY HAVE THE RIGHT TO CANCEL THIS AGREEMENT. IF YOU HAVE THIS RIGHT, THE CREDITOR IS REQUIRED TO PROVIDE YOU WITH A SEPARATE WRITTEN NOTICE SPECIFYING THE CIRCUMSTANCES AND TIMES UNDER WHICH YOU CAN EXERCISE THIS RIGHT.

**SIGNATURES:** By signing below, Mortgagor agrees to the terms and covenants contained in this Security Instrument and in any attachments. Mortgagor also acknowledges receipt of a copy of this Security Instrument on the date stated on page 1.

_/s/ Vadim Borodyansky_                                   _/s/ Alla Rytova_
(Signature) VADIM BORODYANSKY      (Date)    (Signature) ALLA RYTOVA      (Date)

..........................................................    ..........................................................
(Signature)                        (Date)     (Signature)                        (Date)

**ACKNOWLEDGMENT:**
(Individual) STATE OF ..NEW YORK.............................., COUNTY OF ..KINGS.............................. } ss.
On this ...... 2nd ............ day of ...... March .................. in the year of 2004 ............... before me, the undersigned, personally appeared ..Vadim Borodyansky and Alla Rytova..............................

personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

My commission expires: ..............

..........................................................
Notary Public - State of New York

[Notary Seal: MALKA ARYEH, NOTARY PUBLIC, No. 01AR6082695, COMMISSION EXPIRES 11/4/2006, KINGS COUNTY NY]

©1993, 1997 Bankers Systems, Inc., St. Cloud, MN  Form OCP-REMTG-NY 9/14/99                                                              (page 4 of 4)

EXHIBIT A

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND WITH THE BUILDINGS AND IMPROVEMENTS THEREON ERECTED, SITUATE, LYING AND BEING IN THE BOROUGH OF STATEN ISLAND, COUNTY OF RICHMOND, CITY AND STATE OF NEW YORK.

BEGINNING AT A POINT ON N THE SOUTHWESTERLY SIDE OF SEACREST AVENUE 50.0 FEET WIDE DISTANT 170.22 FEET SOUTHEASTERLY, AS MEASURED ALONG SAID SOUTHWESTERLY SIDE OF SEACREST AVENUE, FROM THE POINT FORMED BY THE INTERSECTION OF SAID SOUTHWESTERLY SIDE OF SEACREST AVENUE WITH THE SOUTHEASTERLY SIDE OF TENNYSON DRIVE; RUNNING

THENCE SOUTH 53 DEGREES 03 MINUTES 20 SECONDS EAST 50.00 FEET TO A POINT AT SOUTHEASTERLY TERMINUS OF SEACREST AVENUE;

THENCE ALONG SAID SOUTHEASTERLY TERMINUS OF SEACREST AVENUE NORTH 36 DEGREES 56 MINUTES 40 SECONDS EAST 50.00 FEET TO A POINT;

THENCE SOUTH 53 DEGREES 03 MINUTES 20 SECONDS EAST 80.78 FEET TO A POINT INTO RARITAN BAY

THENCE SOUTH 36 DEGREES 56 MINUTES 40 SECONDS EAST 40 FEET TO A POINT

THENCE SOUTH 53 DEGREES 03 MINUTES 20 SECONDS EAST 10.00 FEET

THENCE ALONG SAID SOUTHWESTERLY SIDE OF A 10 FEET WIDE LANE NORTH 36 DEGREES 56 MINUTES 40 SECONDS EAST 40.00 FEET TO THE POINT OR PLACE OF BEGINNING.

PPN:    05321-0108

46514485

**National City.**  EQUITY RESERVE℠ AGREEMENT – NATIONAL HOME EQUITY

Date: 3/02/2004
Account No.: 4892181609076998

You, the undersigned, are opening an Equity Reserve Line of Credit (Line) with National City Bank (Bank) and agree that the following terms and conditions will apply to your Line.

**Line of Credit.** Your Line is an open-end line of credit which you may use to obtain cash advances (Advances) from time to time for a period of 10 years (Draw Period). If you continue to meet Bank's then current credit and collateral value criteria, at Bank's discretion, Bank will either extend the Draw Period for one or more additional Draw Periods or Bank will refinance your Line on the terms then being offered by Bank for Equity Reserve Lines of Credit. If your Draw Period is not renewed or the Line refinanced, you may repay any outstanding balances during the Repayment Period as provided in the Payment section below.

The initial amount of your Line is $ 408,000.00 (Credit Line). You have the option anytime during the term of this Agreement to create Fixed Rate Partitions of all or part of your Line at a fixed rate and for a fixed payment. The Fixed Rate Partition balance includes the partition advance fee (FRP). Any amount you repay on the Line and/or on an FRP will be again available to you on the Line until the Maturity Date. Bank may reduce the amount of your Credit Line under certain conditions described in this Agreement.

**Advances.** You may obtain Advances under your Line by issuing Equity Reserve checks and special FRP checks (Checks) supplied by Bank, or by way of any other Bank approved plan. Bank will charge your Checks directly against your Line. You may make arrangements for an Advance on your Line to pay off any FRP at any time by contacting Customer Service at the address or phone number on your statement. You should notify Bank when you need more Checks. The minimum Advance that you can receive using an FRP Check is $5,000. FRP checks for less than $5,000 are charged against your Line. You should also notify Bank immediately if your Checks are lost or stolen. (Please see the "Stop Payment Orders" section of this Agreement.) Your statement will list Checks that have been paid, but the actual paid Checks will not be returned to you. You may request copies of paid Checks from the Bank, and a copying fee may be charged.

Bank may issue you a Card or Cards for use with the Line. Credit card access may not be offered in all states. The word Card can mean one or more credit cards or Automated Teller Machine (ATM) cards. You authorize Bank to issue you a credit card for use with the Line. You may purchase goods or services from merchants who honor the Card. You may obtain Advances from Bank or any other financial institution that honors the Card. You may also obtain Advances by using a Personal Identification Number (PIN) for telephone banking or on-line banking Advances. Bank will charge all Advances to your Line. If you allow someone else to use your Card or PIN and you want to stop such use, you must let Bank know in writing. If he or she has a Card or PIN, you must return the Card with your written notice and/or request a new PIN.

You must notify Bank immediately if your Cards or PIN are lost or stolen, or you believe that some person may be using your Card(s) or PIN without permission. You will not use your Line after notifying Bank of loss, theft or unauthorized use of your Card(s) or PIN. You will not be held liable for any unauthorized use of the Card or Pin after you have notified Bank of the loss or theft by phone at 1-800-535-6596 or in writing as National City Card Services, P.O. Box 4092, Kalamazoo, Michigan 49003. (Otherwise you may be liable, but not for more than $50.00.) Bank may terminate the use of your Card or PIN if you lose your Card or PIN two times or more in a twelve month period. Bank may also terminate the use of your Card or PIN if your new balance exceeds your Credit Line by 2% or if you are over limit for more than one billing cycle.

Bank will have no obligation to honor any Advance by any means if the resulting new balance of your Line would exceed your Credit Line; or after the Maturity Date; or in the event of termination or suspension of your Credit Line under the conditions described in this Agreement, and upon Bank's request you will return Checks and/or Cards. Your Line may not be used for internet lottery, betting or gambling transactions or for any illegal transactions.

Charges from foreign merchants and financial institutions may be made in a foreign currency. We will bill you in U.S. Dollars based on the exchange rate on the day we settle the transaction, plus any special currency exchange charges. In the case of VISA Accounts: The exchange rate applied to each such transaction is a (A) wholesale market rate or (B) government-mandated rate, in effect one day prior to the processing date, increased by one percent. Because of the special charges and possible differences in exchange rates between the time we settle and the time you initiated the transaction, the total charge for a foreign transaction may be greater than the cash advance or purchase at the time it was made.

**Finance Charge for Line and Fixed Rate Partition Advances.**

a) **Line Advances:** Bank figures the finance charge on your Line by applying the periodic rate to the "average daily balance" of your Line. To get the "average daily balance", Bank takes the beginning balance of the Line each day, adds any new Advances including if applicable, the broker and processing fees, and other debits, and subtracts any payments or credits and unpaid periodic finance charges. This gives the daily balance. Then, Bank adds up all the daily balances for the billing cycle and divides the total by the number of days in the billing cycle. This gives the "average daily balance".

Advances are subject to finance charges from the date of transaction to the date payment is posted to the Line. The periodic rate of finance charge and the annual percentage rate are subject to change, based on the value of an index. The index in effect for each billing cycle shall be the "Prime Rate" of interest appearing in the Money Rates Table of The Wall Street Journal published on the first day of your Billing Cycle (or, if not published on that date, the last edition published prior to that date), rounded upward, if necessary, to the nearest .01% (Index).

The **ANNUAL PERCENTAGE RATE** is the Index plus ___0.000___ %. The **FINANCE CHARGE** for each billing cycle shall be computed at the annual percentage rate divided by 12. The current periodic rate of **FINANCE CHARGE** is ___0.333___ % per month, which corresponds to an **ANNUAL PERCENTAGE RATE** of ___4.000___ %.

The annual percentage rate and the periodic rate of finance charge may increase if the Index increases. In the event of an increase, the finance charge will increase and the minimum payment amount may increase. An increase or decrease in the annual percentage rate will result in a corresponding increase or decrease in the minimum payment amount.

b) **Fixed Rate Partition Advances:** Bank figures the finance charge on each FRP by applying the periodic rate to the "average daily balance" of the FRP. To get the "average daily balance", Bank takes the beginning balance of the FRP each day and subtracts any payments or credits and unpaid periodic finance charges. This gives the daily balance. Then, Bank adds up all the daily balances for the billing cycle and divides the total by the number of days in the billing cycle. This gives the "average daily balance".

Each FRP is subject to finance charges from the date of the transaction until paid in full. The periodic rate of finance charge and the annual percentage rate are determined and fixed on the business day the transaction posts to your Line. The Index shall be the daily rate for 5-year Treasury notes with constant maturities for the 10th business day prior to the last business day of the calendar month preceding the month in which the transaction posts to your Line, rounded upward, if necessary, to the nearest .01% (Index). The Index can be found in the Federal Reserve Statistical Release H.15 at www.federalreserve.gov/releases/h15.

The **ANNUAL PERCENTAGE RATE** is the Index plus ___3.750___ %. The **FINANCE CHARGE** for each billing cycle shall be computed at the annual percentage rate divided by 12. The current periodic rate of **FINANCE CHARGE** is ___0.495___ % per month, which corresponds to an **ANNUAL PERCENTAGE RATE** of ___5.940___ %.

c) **Both Line and Fixed Rate Partition Advances:** In no event shall the periodic rate of **FINANCE CHARGE** be more than 2.083% per month or less than 0.25% per month and in no event shall the **ANNUAL PERCENTAGE RATE** be more than 25.0% or less than 3.0%. The annual percentage rate includes only interest and not other costs. Your monthly statement will disclose the applicable annual percentage rate for the billing cycle.

Other Finance Charges.  A _broker_ fee **FINANCE CHARGE** of $2,000.00
A processing fee **FINANCE CHARGE** of $
A Partition Advance fee **FINANCE CHARGE** of $50 for each Fixed Rate Partition used.

05/03

ERAQTY1

Other Charges. In addition to finance charges, the following other charges will apply:

- An annual fee of $50 reflected on the monthly statement for the first billing cycle of each year of your Draw Period beginning with the 13th billing cycle, whether or not you obtain Advances under your Line. This fee is not refundable.
- A late payment fee of the greater of 10% of the unpaid minimum payment or $40, if Bank does not receive your minimum payment at the address shown on your statement within 10 days of the Due Date. Bank may charge an additional late payment fee for each billing cycle that your Line is past due.
- An overlimit fee of $25 whenever you go over your Credit Line. Bank may charge an additional $25 for each billing cycle that you remain over your Credit Line.
- A returned payment fee of $25 if you make a payment on your Line which is returned to Bank unpaid because of insufficient funds, a closed account, stop payment, or any other reason.
- A returned check fee of $25 if you write a Check that Bank dishonors under the "Advances" section of this Agreement.
- A stop payment fee of $25 for the service of stopping payment on a Check and a $25 service fee for renewal of each stop payment order.
- An early termination fee of $_____0.00_____ if you close your Line within the first 36 months.
- A document request fee of $6 per copy for service of providing copies. Bank will not charge you for documents Bank is required to give you by law.
- Any real estate related closing fees due at the closing of your Line are reflected on the HUD1 settlement statement provided to you by the closing agent and which is hereby incorporated and made part of this Agreement by this reference.

Bank does not lose any of its other rights under this Agreement whether or not it charges late payment or overlimit fees. The application of any fee shall not cure the default which initiated the fee.

**Security Interests.** Your Line will be secured by a mortgage (Mortgage) on your dwelling (Dwelling). If the Dwelling is your primary or secondary residence, you represent and warrant to Bank that at all times during the term of this Agreement your Dwelling, or a minimum of one unit of your multi-unit Dwelling, shall be occupied by you and shall not be used as rental property. Bank agrees to waive any security interest in the Dwelling to the extent it secures Advances which may be in excess of your Credit Line. You name Bank as loss payee and beneficiary of the proceeds of, and assign to Bank any unearned premiums of, all insurance connected with your Line. You must not adversely affect Bank's interest in the Dwelling by any action or inaction. You must keep the Dwelling in good condition, promptly pay all mortgages and other liens against the Dwelling, and promptly pay all taxes and assessments on the Dwelling. You must not sell or transfer title to the Dwelling without Bank's permission, or use the Dwelling for any illegal purpose.

**Property Insurance.** You must keep the Dwelling fully insured against loss or damage on terms which are acceptable to Bank to the extent permitted by law. You must carry flood insurance if required by federal law. You may obtain property insurance from anyone that is acceptable to Bank. You agree to furnish Bank with written evidence of such insurance, with Bank named as loss payee. If you fail to do so, Bank may buy insurance to protect Bank's interest and add the premium cost to the unpaid balance of your Line, subject to the same finance charges as Advances against your Line. You assign to Bank the proceeds from any such insurance policies up to the unpaid balance of your Line. Bank may apply such proceeds, including any return of unearned premiums and payments for claims under such policies, to reduce the unpaid balance of your Line. You irrevocably authorize Bank as your agent and on your behalf to negotiate, settle and release any claim under your insurance and to submit insurance claims for you and to receive and sign your name to any checks or drafts or related papers obtained from insurance companies.

**Credit Life and Disability Insurance.** Credit life and disability insurance (Credit Insurance) is not required to obtain credit and will not be provided unless permitted by law and you sign a separate enrollment form and agree to pay the additional cost stated on that form. Premiums will be billed to your Line and treated as Advances. If you elect to purchase Credit Insurance you agree that with respect to such Credit Insurance: (a) it is subject to any limitations and conditions contained in their documentation which you have read; (b) a copy of their documentation will be sent to you by us as soon as practicable; and (c) you still must maintain all insurance required by this Agreement.

**Tax Deductibility.** You should consult a tax advisor regarding the deductibility of interest and charges on your Line.

**Statements.** Bank agrees to mail or deliver to you a monthly statement for each billing cycle at the end of which there is a balance which is a debit or credit balance of more than $1 or on which a finance charge has been imposed. The balance is the sum of all outstanding Advance(s), fees, payments, other credits, other charges and debits, and finance charge(s).

**Payments.** Your payments will be due monthly. You may pay the entire unpaid balance of your Line and/or your FRP(s) at any time. You are required to pay a minimum payment by the Due Date shown on your statement equal to the sum of the Line Minimum Payment and the FRP Minimum Payment for each FRP in use.

    a) Line Minimum Payment: The Line Minimum Payment will equal the periodic finance charges that accrued on the outstanding Line balance during the preceding billing cycle as shown on each monthly statement (Interest Only Minimum Payment).

    b) The FRP Minimum Payment is: A fixed payment amount that is sufficient to pay off the Partition Advance Fee, the balance and periodic finance charges for each FRP, if one hundred twenty (120) equal payments at the fixed rate applicable to that FRP were made. Any amount still owing after one hundred nineteen (119) billing cycles will be added to the final minimum payment due. Additional payments on any FRP may be made at any time but you will continue to be obligated to make the fixed payment for the FRP as long as any amount is still owing on the FRP. The amount of any reduction in principal from a payment on an FRP will become available to you on your Line once it is posted, until the Maturity Date of your Line. If your Draw Period is not renewed then access to the Line will not be available during the Repayment Period.

    c) Repayment Period: The Minimum Payment may not fully repay the principal that is outstanding by the Maturity Date. If your Draw Period is not renewed for an additional term, during the Repayment Period you may continue to make scheduled payments on any Fixed Rate Partition balances outstanding at Maturity Date until they are paid in full. Additionally, any outstanding line balance and Other Charges will be converted to a Fixed Rate Partition balance without a Partition Advance fee on the last business day of your Draw Period and will be subject to finance charges for a Fixed Rate Partition, and will be required to be repaid in one hundred twenty (120) equal monthly payments for balances of $5,000 or more; or sixty (60) equal monthly payments for balances of less than $5,000. Any amount still owing after one hundred nineteen (119) billing cycles or after fifty nine (59) billing cycle respectively, will be added to the final minimum payment due.

Payments will be applied in the following order: First, to each FRP on a first in-first out basis for all unpaid periodic finance charges and then to the FRP's principal balance in an amount necessary to amortize the FRP within its amortization schedule, then to all unpaid periodic finance charges on the Line, then to all Other Charges, then to the Line. For introductory and promotional offer balances, payments to the Line are applied on the basis of the lowest rate balance first to highest rate balance last. If there are no balances on the Line, overpayments are applied as a prepayment to the FRP(s) on a first in-first out basis. If there are no balances on any FRP or on the Line, overpayments are credited to the Line and returned upon request. In order to make additional partial prepayments to an FRP or to prepay an FRP in full without paying off your Line, you must contact Customer Service to make arrangements to do so.

**Stop Payment Orders.** We agree to honor a stop payment order against a Check when received from you within a reasonable time prior to payment. A stop payment order becomes effective after we have actually received the order and had a reasonable time to process it, and the order will remain in effect for thirteen months. Our acceptance of a stop payment order does not mean that the Check has not yet been paid, and we shall have no liability resulting from the payment of a Check before your stop payment order becomes effective. A stop payment order may be renewed for successive periods equal to its original period of effectiveness if we receive a renewal notice prior to the order becoming ineffective.

A stop payment order against a Check must accurately describe it as to date, number, amount, and payee, and must correctly recite your name and the Account number. You agree that it is current industry standard to process stop payment orders by means of computer technology. Accordingly, your failure to provide the exact identification of Account number and Check number in order to identify the Check to be stopped will result in the Check being paid if presented, and we will not be liable for such payment. Errors in your name or the Account number, or inaccuracies in the description of the number, amount, issue date or payee on your written stop payment order shall relieve us from any liability for any mistaken payment or wrongful dishonor. Any errors on our written acknowledgment to you of a stop payment order, must be reported by you in writing to our Customer Service Department within 10 calendar days of the written acknowledgment date. We shall not be liable for any mistaken payment or wrongful dishonor occurring after the 10-day period, unless errors or inaccuracies are so reported to us within the 10-day period.

Before we will rescind a stop payment order, our Customer Service Department may require 60 days of a written notice of your request for the withdrawal of the order.

In the event we recredit the Account for a paid Check, then you hereby assign to us all rights against third parties. You or any joint account holder may order a stop payment. You agree that we will not be obligated to reimburse you immediately upon notice of alleged wrongful payment; that it is your obligation to prove the fact and amount of damage suffered; and that in no case will we be liable for more than your actual damage.

We shall not be liable for any damages unless we have failed to act in good faith and exercise ordinary care. You agree to indemnify us and hold us harmless from any and all expenses incurred or damages suffered by us in honoring a stop payment order.

To place a stop payment order, write to National City, Equity Reserve Stop Payment Department, 4661 E. Main Street, Columbus, Ohio 43251-0928.

**Termination of Line.** Bank can terminate your Line and require you to pay the entire outstanding balance in one payment if you breach a material obligation of this Agreement in that:
- You engage in fraud or material misrepresentation in connection with your Line.
- You do not meet the repayment terms of this Agreement.
- Your action or inaction adversely affects the collateral or Bank's rights in the collateral.

To the extent permitted by 11 USC 506, Bank shall be entitled to reasonable court costs and attorneys' fees for independent counsel that Bank hires. Interest after termination, whether prior to or after judgment by a court of competent jurisdiction, shall accrue upon the outstanding unpaid balance (at the rate determined under this Agreement) until such balance is paid in full.

**Suspension or Reduction of Credit Line.** Bank can refuse to make additional extensions of credit or reduce your Line if you breach a material obligation of this Agreement in that:
- The value of the Dwelling securing your Line declines significantly below its present appraised value for purposes of the Credit Line.
- Bank reasonably believes you will not be able to meet the repayment requirements due to a material change in your financial circumstances.
- You are in default of a material obligation under this Agreement.
- Government action prevents the Bank from imposing the annual percentage rate provided for or impairs the Bank's security interest such that the value of the interest is less than 120 percent of the Credit Line.
- A regulatory agency has notified the Bank that continued Advances would constitute an unsafe or unsound practice.
- The maximum annual percentage rate is reached.

If your Line is suspended and you have used any FRP(s) then at Bank's option Bank may terminate the FRP(s) and transfer any FRP balances to your Line.

Bank will give you written notice of any such action and conditions for reinstating your credit privileges. Bank may reinstate your credit privileges when the conditions leading to suspension are cured to Bank's satisfaction. Bank may require you to request reinstatement of credit privileges when the conditions leading to suspension or reduction of your Credit Line no longer exist. An additional title examination and other documentation may be required to reinstate your line, and any costs associated with reinstatement will be paid by you where permitted by law.

**Change in Terms.** Bank may change certain terms of this Agreement at any time by giving you 15 days prior notice:
- The index and margin used for this Line if the original index is no longer available.
- A change that you specifically agree to.
- A change that benefits you.
- An insignificant change.
- Other changes permitted by applicable law.

Any change in terms will apply to balances outstanding on the effective date of the change as well as to balances generated thereafter.

**Other Provisions.** You shall promptly notify Bank of any change in circumstances which has a substantial adverse effect on your credit. You will furnish Bank with financial statements in a form satisfactory to Bank as Bank may request from time to time. Bank may also require a title examination and/or appraisal from time to time, the cost of which will be paid by you where permitted by law.

If this Agreement is signed by more than one borrower, each of you may draw Checks on the Line or use the Cards, and each and every borrower is jointly and severally liable for all Advances and charges on the Line. Any of you may direct Bank to not make further Advances on the Line, however, reinstatement will only be made on the joint request of all of you.

Your rights in your Line may not be assigned. The Mortgage may not be assumed by a subsequent purchaser of the Dwelling. All fees paid to Bank are not refundable.

All of Bank's rights under this Agreement are valid to the extent permitted by applicable law. If it is determined for any reason that any part of this Agreement is invalid or unenforceable, this shall not affect the validity or enforcement of any other provision, and this Agreement will then read as if the invalid or unenforceable part were not there.

Bank may delay exercising any of its rights under this Agreement without losing them. We may accept late payments or partial payments without losing any of our rights. If your payment is marked with the words "Paid in Full" or similar language, you must send your payment to the Customer Service address listed on your Statement. If your payment is made to any other address, we may accept the payment without losing any of our rights.

You understand that Bank is a national bank located in Ohio, and that Bank's decision to extend the Line to you was made in Ohio. Therefore, this Agreement and your use of the Line, Credit Line, Cards, and Checks, shall be governed by and construed in accordance with Federal law including but not limited to 12 USC § 85 and the laws of Ohio, without regard to conflict of law rules.

The annual IRS Form 1098 will be issued only to the first borrower listed on this Agreement at origination and the designation of a borrower as first cannot be changed subsequently.

An electronic or optically imaged reproduction of this Agreement or any other document related to your Loan constitutes an original document and may be relied on in full by all parties to the same extent as an original.

From time to time, we may offer you special rates for balance transfer transactions or introductory or promotional offers on your Line. If we do, we will advise you of the annual percentage rates and finance charges associated with the special rate offer, how long they will be in effect, the balances to which they will apply, and other terms of the special rate offer. Any special rate offer will be subject to the terms of the offer and this Agreement.

You agree that you and Bank have an established business relationship, that Bank may contact you, that such contacts are not unsolicited, that Bank may monitor telephone calls with you to assure quality customer service and that Bank may contact you with an automated dialing and announcing device to the extent permitted by law.

Except as otherwise prohibited by law, you agree and consent that Bank and its affiliates (collectively "National City") may provide to others information about Bank's transactions and experiences with you. Also, Bank may share with its affiliates all information about you for the purpose, among other things, of evaluating credit applications or offering products and services that Bank believes may be of interest to you. Under the Fair Credit Reporting Act there is certain credit information that cannot be shared about you (unless you are a business) if you tell us by writing to us at P.O. Box 94985, Cleveland, Ohio 44101-4985 including your name, address, Line (account) number and social security number.

05/03          HRAQTY3

You authorize us to furnish information concerning you to consumer reporting agencies and others who may properly receive such information. You are hereby notified that a negative credit report reflecting on your credit record may be submitted to a consumer credit reporting agency if you fail to fulfill the terms of your credit obligations. If you believe that we have information about you that is inaccurate or that we have reported or may report to a credit reporting agency information about you that is inaccurate, please notify us of the specific information that you believe is inaccurate by writing to us at P.O. Box 94982, Cleveland, Ohio 44101, Attn: Credit Bureau Disputes, Locator 7113.

NOTICES. You acknowledge receipt of the following notices before becoming obligated:

If you sign this Agreement in California and it is secured by a deed of trust: Lender, may at its option, declare the entire balance of the Secured Debt to be immediately due and payable upon the creation of, or contract for the creation of, any lien, encumbrance, transfer or sale of the Property.

If you sign this Note in Colorado: If your payments are received after the due date, even if received before the date a late fee applies, you may owe additional and substantial money at the end of the credit transaction and there may be little or no reduction of principal. This is due to the accrual of daily interest until a payment is received.

If you sign this Agreement in Connecticut and it is secured by a mortgage: Your Initial Draw Period will be 9 years 10 months and cannot be renewed for additional draw periods.

If you sign this Agreement in Florida and it is secured by a mortgage: FLORIDA DOCUMENTARY STAMP TAX IN THE AMOUNT REQUIRED BY LAW HAS BEEN PAID OR WILL BE PAID DIRECTLY TO THE DEPARTMENT OF REVENUE, AND FLORIDA DOCUMENTARY STAMPS HAVE BEEN PLACED ON THE TAXABLE INSTRUMENTS AS REQUIRED BY CHAPTER 201, FLORIDA STATUTES.

If you sign this Agreement in Maryland: We elect Subtitle 9, Credit Grantor Open End Credit Provisions, of Title 12 of the Commercial Law Article of the Annotated Code of Maryland only to the extent not inconsistent with 12 U.S.C. § 85 and related regulations and opinions, and we expressly reserve all rights thereunder.

If you sign this Agreement in Minnesota: If the amount of this Loan is $100,000 or more, we elect Minn. Stat. § 334.01 only to the extent not inconsistent with 12 U.S.C. § 85 and related regulations and opinions, and we expressly reserve all rights thereunder.

If you sign this Agreement in Missouri: Oral agreements or commitments to loan money, extend credit or to forbear from enforcing repayment of a debt including promises to extend or renew such debt are not enforceable. To protect you (borrower(s)) and us (creditor) from misunderstanding or disappointment, any agreements we reach covering such matters are contained in this writing, which is the complete and exclusive statement of the agreement between us, except as we may later agree in writing to modify it.

If you sign this Agreement in New Jersey: Where this Agreement refers to acts or practices that may or will be taken by us unless prohibited by, or unless required by, or subject to, or as permitted by the requirements or restrictions of applicable law, New Jersey law permits or requires the act or practice.

If you sign this Agreement in New York and it is secured by a mortgage: YOU SHOULD CHECK WITH YOUR LEGAL ADVISOR AND WITH OTHER MORTGAGE LIEN HOLDERS AS TO WHETHER ANY PRIOR LIENS CONTAIN ACCELERATION CLAUSES WHICH WOULD BE ACTIVATED BY A JUNIOR ENCUMBRANCE.

DEFAULT IN THE PAYMENT OF THIS LOAN AGREEMENT MAY RESULT IN THE LOSS OF THE PROPERTY SECURING THE LOAN. UNDER FEDERAL LAW, YOU MAY HAVE THE RIGHT TO CANCEL THIS AGREEMENT. IF YOU HAVE THIS RIGHT, THE CREDITOR IS REQUIRED TO PROVIDE YOU WITH A SEPARATE WRITTEN NOTICE SPECIFYING THE CIRCUMSTANCES AND TIMES UNDER WHICH YOU CAN EXERCISE THIS RIGHT.

If you sign this Agreement in North Dakota: THIS OBLIGATION MAY BE THE BASIS FOR A PERSONAL ACTION AGAINST THE PROMISOR OR PROMISORS IN ADDITION TO OTHER REMEDIES ALLOWED BY LAW.

If you sign this Agreement in Oregon: NOTICE TO THE BORROWER: Do not sign this loan agreement before you read it. The loan agreement provides for the payment of a penalty if you wish to repay the loan prior to the date provided for repayment in the loan agreement.

If you sign this Note in Vermont: NOTICE TO CO-SIGNER: YOUR SIGNATURE ON THIS NOTE MEANS THAT YOU ARE EQUALLY LIABLE FOR REPAYMENT OF THIS LOAN. IF THE BORROWER DOES NOT PAY, THE LENDER HAS A LEGAL RIGHT TO COLLECT FROM YOU.

COPY RECEIVED. You agree to be legally bound to all provisions of this Agreement. You acknowledge receipt of a completed copy of this Agreement, including important information below regarding your rights to dispute billing errors ("Your Billing Rights").

VADIM BORODYANSKY
TYPE OR PRINT NAME                    X /s/ Vadim Borodyansky
                                      SIGNATURE

ALLA RYTOVA
TYPE OR PRINT NAME                    X /s/ Alla Rytova
                                      SIGNATURE

_____
TYPE OR PRINT NAME                    X _____
                                      SIGNATURE

_____
TYPE OR PRINT NAME                    X _____
                                      SIGNATURE

Address of Dwelling: 98 SEACREST AVE STATEN ISLAND , New York 10312

Pay to the Order of
US Mortgage Resolution LLC
Without Recourse
PNC Bank, National Association
/s/ Kimberly Garis
Kimberly Garis - Vice President

05/03                                                                                              HRAQTY4

**YOUR BILLING RIGHTS - KEEP THIS NOTICE FOR FUTURE USE**

This notice contains important information about your rights and our responsibilities under the Fair Credit Billing Act.

**Notify Us In Case of Errors or Questions About your Bill**
If you think your bill is wrong, or if you need more information about a transaction on your bill, write us on a separate sheet at the address listed on your bill. Write to us as soon as possible. We must hear from you no later than 60 days after we sent you the first bill on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.

In your letter, give us the following information.
- Your name and Line number.
- The dollar amount of the suspected error.
- Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are not sure about.

If you have authorized us to pay your bill automatically from your savings or checking account, you can stop payment on any amount you think is wrong. To stop the payment, your letter must reach us three business days before the automatic payment is scheduled to occur.

**Your Rights and Our Responsibilities After We Receive Your Written Notice**
We must acknowledge your letter within 30 days, unless we have corrected the error by then. Within 90 days, we must either correct the error or explain why we believe the bill was correct.

After we receive your letter, we cannot try to collect any amount you question, or report you as delinquent. We can continue to bill you for the amount you question, including finance charges, and we can apply any unpaid amount against your Credit Line. You do not have to pay any questioned amount while we are investigating, but you are still obligated to pay the parts of your bill that are not in question.

If we find that we made a mistake on your bill, you will not have to pay any finance charges related to any questioned amount. If we didn't make a mistake, you may have to pay finance charges, and you will have to make up any missed payments on the questioned amount. In either case, we will send you a statement of the amount you owe and the date it is due.

If you fail to pay the amount that we think you owe, we may report you as delinquent. However, if our explanation does not satisfy you and you write to us within ten days telling us that you still refuse to pay, we must tell anyone we report you to that you have a question about your bill. And, we must tell you the name of anyone we reported you to. We must tell anyone we report you to that the matter has been settled between us when it finally is.

If we don't follow these rules, we can't collect the first $50 of the questioned amount, even if your bill was correct.

**Special Rule for Credit Card Purchases**
If you have a problem with the quality of property or services that you purchased with your Card, and you have tried in good faith to correct the problem with the merchant, you may have the right not to pay the remaining amount due on the property or services. There are two limitations on this right:

(a)   You must have made the purchase in your home state or, if not within your home state, within 100 miles of your current mailing address; and

(b)   The purchase price must have been more than $50.

These limitations do not apply if we own or operate the merchant, or if we mailed you the advertisement for the property or services.

05/03

ERAQTY5

# ALLONGE TO NOTE

**Prepared On:** March 29, 2019

**Reference #:** XXXXXX7810
**Original Loan Amount:** $408,000.00
**Note Date:** March 02, 2004
**Borrower:** VADIM BORODYANSKY, ALLA RYTOVA
**Property Address:** 98 SEACREST AVE, STATEN ISLAND, NY 10312

PAY TO THE ORDER OF

## Windward Bora LLC

WITHOUT RECOURSE

## US Mortgage Resolution LLC

On: March 29, 2019

Sign: *[signature]*

Name: Thomas Dunkel

Title: Manager

**PREPARED BY: FIXnotes LLC**
2001 Market Street, #2500, Philadelphia, PA 19103



Office of the
Richmond County Clerk
130  Stuyvesant  Place
Staten Island, NY 10301

Hon. Stephen J. Fiala, County Clerk



ACS-000000000622686-000000000823544-003

## Recording and Endorsement Cover Page

| | |
|---|---|
| Document Type: | ASSIGNMENT OF MORTGAGE |
| Document Page Count: | 3 |

| PRESENTER: | RETURN TO: |
|---|---|
| PNC BANK, NA<br>3232 NEWMARK DR<br><br>MIAMISBURG, OH 45342 | JENNIFER DAY<br>3232 NEWMARK DR<br><br>MIAMISBURG, OH 45342 |

### PROPERTY DATA

# OF BLOCKS  1    # OF LOTS  1

| Block | Lot | Unit |
|---|---|---|
| 5321 | 0108 Entire Lot | |

### PARTIES

| ASSIGNOR INDEX | ASSIGNEE INDEX |
|---|---|
| PNC BANK, NATIONAL ASSOCIATION<br>3232 NEWMARK DRIVE<br><br>MIAMISBURG, OH 45342<br><br>"And Others" | US MORTGAGE RESOLUTION LLC<br>351 EAST CONESTOGA<br>SUITE 207<br>WAYNE, PA 19087 |

### PAYMENT DETAIL

Make Checks Payable to:

=================================================================

| | |
|---|---|
| Richmond County Clerk: | 36.00 Recording Fees |
| Total Payments For This Document: | 36.00 |

**FEES PAID**

EXAM _____ DATE 10-5-18

RECORDED IN RICHMOND COUNTY

OCT 10 2018




LAND DOC# 716112
25-ASSIGN, AGREE, REL

10/10/2018    10:04:12 A.M.
RECEIPT: 40582   FEE: $36.00
RICHMOND COUNTY CLERK

This Instrument Prepared By, Recording Requested
By and Return To:
Jennifer Day, 937-910-4875
PNC Mortgage, a Division of PNC Bank, NA
3232 Newmark Drive
Miamisburg, Ohio 45342

---

SPACE ABOVE THIS LINE FOR RECORDER'S USE

This assignment is not subject to the requirements of the Section 275 Real Property Law because this is an assignment within the secondary mortgage market.

**Assignment of Mortgage**

PNC#: xxxxxx7810                                              Recording District: RICHMOND

For value received, PNC Bank, National Association, successor by merger to National City Bank located at 3232 Newmark Drive, Miamisburg, Ohio 45342, hereby grants, assigns and transfers to: US MORTGAGE RESOLUTION LLC, located at 351 East Conestoga Road, Suite 207, Wayne, PA 19087, all beneficial interest under that certain Mortgage executed by:

**Borrower(s): VADIM BORODYANSKY, ALLA RYTOVA**

To National City Bank, in the amount of: $408,000.00, dated 03/02/2004, recorded 04/15/2013 as Instrument No.: 473577 of the Official Records of RICHMOND County, New York describing the land therein:

Property Address:    **98 SEACREST AVE, STATEN ISLAND, NEW YORK 10312**
                    **Section: 23 Block: 5321 Lot: 108**
                    See attached for Legal Description

Together with the Note or Notes therein described or referenced to, the money due and to become due thereon with interest, and all rights accrued or to accrue under said Mortgage.

Dated: 9-19-2018

PNC Bank, National Association, successor by merger to National City Bank

_____
Joni L. Mays, Assistant Vice President

State of Ohio    County of Montgomery

On 9-19-2018 before me, Cassandra Sherman the undersigned, a Notary Public in and for the State of Ohio, personally appeared Joni L. Mays, Assistant Vice President of PNC Bank, National Association, successor by merger to National City Bank personally known to me to be the person whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her authorized capacity, and that for her signature on the instrument the person, or the entity upon behalf of which she acted, executed the instrument.

_____
Cassandra Sherman, Notary Public in and for the State of Ohio
My Commission Expires: 3/29/2023
My County of Residence: Montgomery

EXHIBIT A

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND WITH THE BUILDINGS AND IMPROVEMENTS THEREON ERECTED, SITUATE, LYING AND BEING IN THE BOROUGH OF STATEN ISLAND, COUNTY OF RICHMOND, CITY AND STATE OF NEW YORK.

BEGINNING AT A POINT ON N THE SOUTHWESTERLY SIDE OF SEACREST AVENUE 50.0 FEET WIDE DISTANT 170.22 FEET SOUTHEASTERLY, AS MEASURED ALONG SAID SOUTHWESTERLY SIDE OF SEACREST AVENUE, FROM THE POINT FORMED BY THE INTERSECTION OF SAID SOUTHWESTERLY SIDE OF SEACREST AVENUE WITH THE SOUTHEASTERLY SIDE OF TENNYSON DRIVE; RUNNING

THENCE SOUTH 53 DEGREES 03 MINUTES 20 SECONDS EAST 50.00 FEET TO A POINT AT SOUTHEASTERLY TERMINUS OF SEACREST AVENUE;

THENCE ALONG SAID SOUTHEASTERLY TERMINUS OF SEACREST AVENUE NORTH 36 DEGREES 56 MINUTES 40 SECONDS EAST 50.00 FEET TO A POINT;

THENCE SOUTH 53 DEGREES 03 MINUTES 20 SECONDS EAST 80.78 FEET TO A POINT INTO RARITAN BAY

THENCE SOUTH 36 DEGREES 56 MINUTES 40 SECONDS EAST 40 FEET TO A POINT

THENCE SOUTH 53 DEGREES 03 MINUTES 20 SECONDS EAST 10.00 FEET

THENCE ALONG SAID SOUTHWESTERLY SIDE OF A 10 FEET WIDE LANE NORTH 36 DEGREES 56 MINUTES 40 SECONDS EAST 40.00 FEET TO THE POINT OR PLACE OF BEGINNING.



Office of the
Richmond County Clerk
130  Stuyvesant  Place
Staten Island, NY 10301

Hon. Stephen J. Fiala, County Clerk



ACS-000000000647189-000000000854430-003

### Recording and Endorsement Cover Page

Document Type: ASSIGNMENT OF MORTGAGE
Document Page Count: 3

| PRESENTER: | RETURN TO: |
|---|---|
| RICHMOND MONROE GROUP<br>P.O. BOX 458<br><br>KIMBERLINGCITY, MO 65686 | RICHMOND MONROE GROUP<br>P.O. BOX 458<br><br>KIMBERLINGCITY, MO 65686 |

PROPERTY DATA     # OF BLOCKS   1     # OF LOTS    1

| Block | Lot | Unit |
|---|---|---|
| 5321 | 108 | Entire Lot |

### PARTIES

| ASSIGNOR INDEX | ASSIGNEE INDEX |
|---|---|
| US MORTGAGE RESOLUTION LLC | WINDWARD BORA LLC |

### PAYMENT DETAIL

Make Checks Payable to:
==================================================================
Richmond County Clerk:                 36.00 Recording Fees
                                       ---------------------
Total Payments For This Document:      36.00      FEES PAID
==================================================================

EXAM  ___  DATE  5/14/19   RECORDED IN RICHMOND COUNTY

MAY 15 2019

COUNTY CLERK

LAND DOC# 739029
25-ASSIGN, AGREE, REL.

05/  /2019    10:18:05 A.M.
RECEIPT: 17482   FEE: $36.00
RICHMOND COUNTY CLERK

PREPARED ON March 29, 2019

**When Recorded Return To:**
CROSBY CAPITAL, LLC/Kaleena Ogo
P.O. BOX 458
KIMBERLING CITY, MO 65686
Ref#: 0008000000000025 / 7500817810

SPACE ABOVE THIS LINE FOR RECORDER'S USE

## CORPORATE ASSIGNMENT OF MORTGAGE

Reference #: XXXXXX7810
Assignor: US Mortgage Resolution LLC (351 E Conestoga Rd, Suite 207, Wayne, PA 19087, USA)
Assignee: Windward Bora LLC (1688 Meridian Ave, 7th Floor, Miami Beach, FL 33139)
Executed by: VADIM BORODYANSKY, ALLA RYTOVA
To: National City Bank

Mortgage Last Assigned from PNC Bank, National Association to US Mortgage Resolution LLC
Recorded on 10/10/2018 as Land Doc # 716112

In the amount of $408,000.00, dated March 02, 2004 and recorded April 15, 2013 in Book/Reel/Liber/Volume: Page/Folio: as Instrument # 473577 in the Official Records of Richmond County (County), State of New York describing the land therein:

Property Address: 98 SEACREST AVE, STATEN ISLAND, NY 10312

Section: 23 Block: 5321 Lot: 108, See attached for Legal Description.

KNOW ALL MEN BY THESE PRESENTS that for value received and other good and valuable consideration, paid to the above named Assignor, the receipt and sufficiency of which is hereby acknowledged, the said Assignor hereby assigns unto the above-named Assignee, the said MORTGAGE, with interest, secured thereby, together with all moneys now owing or that may hereafter become due or owing in respect thereof, and the full benefit of all the powers and of all the covenants and provisos therein contained, and the said Assignor hereby grants and conveys unto the said Assignee, the Assignor's beneficial interest under the MORTGAGE.

TO HAVE AND TO HOLD the said MORTGAGE, and also the said property unto the said Assignee forever, subject to the terms contained in said MORTGAGE.

**US Mortgage Resolution LLC**

On: March 29, 2019

Sign:

Name: Thomas Dunkel

Title: Manager

STATE OF: Pennsylvania (Commonwealth)
COUNTY OF: Chester

On March 29, 2019, before me, Gretchen Frascella Notary Public of the County and State aforesaid, certified that Thomas Dunkel, Manager and authorized signor for US Mortgage Resolution LLC, personally appeared before me this day and acknowledged the execution of the foregoing instrument and that by his/her/their signature on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

Witness my hand and stamp,

Gretchen Frascella

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
GRETCHEN FRASCELLA, Notary Public
Tredyffrin Twp., Chester County
My Commission Expires March 16, 2020



**PREPARED BY: FIXnotes LLC**
2001 Market Street, #2500, Philadelphia, PA 19103

EXHIBIT A

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND WITH THE BUILDINGS AND IMPROVEMENTS THEREON ERECTED, SITUATE, LYING AND BEING IN THE BOROUGH OF STATEN ISLAND, COUNTY OF RICHMOND, CITY AND STATE OF NEW YORK.

BEGINNING AT A POINT ON N THE SOUTHWESTERLY SIDE OF SEACREST AVENUE 50.0 FEET WIDE DISTANT 170.22 FEET SOUTHEASTERLY, AS MEASURED ALONG SAID SOUTHWESTERLY SIDE OF SEACREST AVENUE, FROM THE POINT FORMED BY THE INTERSECTION OF SAID SOUTHWESTERLY SIDE OF SEACREST AVENUE WITH THE SOUTHEASTERLY SIDE OF TENNYSON DRIVE; RUNNING

THENCE SOUTH 53 DEGREES 03 MINUTES 20 SECONDS EAST 50.00 FEET TO A POINT AT SOUTHEASTERLY TERMINUS OF SEACREST AVENUE;

THENCE ALONG SAID SOUTHEASTERLY TERMINUS OF SEACREST AVENUE NORTH 36 DEGREES 56 MINUTES 40 SECONDS EAST 50.00 FEET TO A POINT;

THENCE SOUTH 53 DEGREES 03 MINUTES 20 SECONDS EAST 80.78 FEET TO A POINT INTO RARITAN BAY

THENCE SOUTH 36 DEGREES 56 MINUTES 40 SECONDS EAST 40 FEET TO A POINT

THENCE SOUTH 53 DEGREES 03 MINUTES 20 SECONDS EAST 10.00 FEET

THENCE ALONG SAID SOUTHWESTERLY SIDE OF A 10 FEET WIDE LANE NORTH 36 DEGREES 56 MINUTES 40 SECONDS EAST 40.00 FEET TO THE POINT OR PLACE OF BEGINNING.